UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| ANGELA W. RISNER, ) | No. ED CV 11-495-PLA |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM OPINION AND ORDER** |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on March 25, 2011, seeking review of the Commissioner's denial of her application for Disability Insurance Benefits. The parties filed Consents to proceed before the undersigned Magistrate Judge on April 18, 2011, and April 26, 2011. Pursuant to the Court's Order, the parties filed a Joint Stipulation on November 28, 2011, that addresses their positions concerning the disputed issue in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## BACKGROUND

Plaintiff was born on June 26, 1961. [Administrative Record ("AR") at 38-39.] She completed one year of college, and has past relevant work experience as an insurance claims representative and a real estate salesperson. [AR at 136, 145, 147.]

On May 8, 2007, plaintiff filed her application for Disability Insurance Benefits, alleging that she has been unable to work since January 2, 2006, due to, among other things, multiple back issues, fibromyalgia, headaches, fatigue, depression, bilateral carpal tunnel syndrome, bilateral shoulder impairment and tendonitis, elbow problems, and sleep apnea. [AR at 38-39, 106, 134-46, 189-95.] After her application was denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 52-61, 65-66.] A hearing was held on March 18, 2009, at which time plaintiff appeared with counsel and testified on her own behalf. [AR at 9-37.] A medical expert and a vocational expert also testified. [AR at 12-22, 32-35.] On June 17, 2009, the ALJ determined that plaintiff was not disabled. [AR at 43-51.] On January 28, 2011, the Appeals Council denied plaintiff's request for review. [AR at 3-8.] This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257. When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th

Cir. 1989).  Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner.  Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

## IV.
## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

**A.   THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to

perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. The Commissioner then bears the burden of establishing that the claimant is not disabled, because she can perform other substantial gainful work available in the national economy. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.     THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

In this case, at step one, the ALJ concluded that plaintiff has not engaged in substantial gainful activity since her alleged disability onset date, January 2, 2006. [AR at 45.][1] At step two, the ALJ concluded that plaintiff has the severe impairments of fibromyalgia syndrome; scoliosis with some vertebral wedging of the thoracic spine; degenerative disease of the cervical spine and the lumbar spine; and the residual effects of adhesive capsulitis of the right shoulder. [AR at 46.] At step three, the ALJ determined that plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the impairments in the Listing. [Id.] The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[2] "to lift and carry ten pounds frequently and twenty pounds occasionally; ... stand and/or walk for six hours of an eight hour workday; [and] ... sit for six hours of an eight hour workday," except that plaintiff "is limited to occasional reaching in all directions, handling, stair climbing, balancing, kneeling, crouching, and stooping; she is precluded from repetitive fine manipulation and fingering; she is precluded from crawling and from repetitive overhead work; she should avoid exposure to extreme cold; she is precluded from working around unprotected heights or close to moving machinery; she is precluded from climbing ladders, ropes, or scaffolds; and, she is limited to moderate exposure to

---

[1] The ALJ concluded that plaintiff meets the insured status requirements of the Social Security Act through December 31, 2010. [AR at 45.]

[2] RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

vibrating equipment." [AR at 49-50.]³ At step four, the ALJ concluded that plaintiff is capable of performing her past relevant work as a real estate agent. [AR at 51.] Accordingly, the ALJ determined that plaintiff is not disabled. [Id.]

## V.
## **THE ALJ'S DECISION**

Plaintiff contends that the ALJ failed to properly evaluate her subjective symptom testimony. [JS at 3-6.]

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). Second, if the claimant meets the first test, the ALJ may only reject the claimant's testimony about the severity of her symptoms upon (1) finding evidence affirmatively suggesting that the claimant was malingering, or (2) offering specific, clear and convincing reasons for doing so. See Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1999); see also Lingenfelter, 504 F.3d at 1036; Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003). The factors to be considered in weighing a claimant's credibility include: (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's testimony or between the claimant's testimony and her conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th

---

³ While the ALJ did not state in his decision that he determined that plaintiff can perform "light work" as defined in 20 C.F.R. § 404.1567(b), his RFC determination for plaintiff most closely resembles that of an individual who can perform "light work" under the Regulations. 20 C.F.R. § 404.1567(b) defines "light work" as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and requiring "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls."

Cir. 2002); see also 20 C.F.R. §§ 404.1529(c), 416.929(c). If properly supported, the ALJ's credibility determination is entitled to "great deference." See Green v. Heckler, 803 F.2d 528, 532 (9th Cir. 1986).

Plaintiff testified, in part, that she is "in pain all day long." [AR at 26.] Specifically, plaintiff stated that she has pain "from [her] neck all across the top of the scapula or in the rhomboid area," and that the pain "radiates down both arms, more so on the right." [AR at 26-27.] She also testified that her mid-back "has knots in it." [AR at 27.] In addition, plaintiff stated that she has tension headaches daily and migraine headaches "maybe once a week." [AR at 29.] Plaintiff stated that as a result of her pain, she can only sit for 30 or 40 minutes before needing to stand up or lie down, can only stand for 40 or 45 minutes before needing to sit down or lie down, and needs to rest or lie down for about three hours every day. [AR at 30-31.] She also testified that she experiences "complete numbness in [her] hand" and has problems gripping and holding onto things. [AR at 31-32.]

At step one of the two-step credibility analysis, the ALJ did not explicitly state that he found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. [See AR at 50.] The ALJ nevertheless concluded that "the allegations by [plaintiff] as to the intensity, persistence, and limiting effects of her symptoms are not well supported by probative evidence and are not wholly credible." [Id.] Thus, it appears that at step one, the ALJ implicitly found that plaintiff's medically determinable impairments could reasonably be expected to produce some of the pain or other symptoms plaintiff alleged. At step two, then, as the record contains no evidence of malingering by plaintiff,[4] the ALJ was required to offer "specific, clear and convincing reasons" for rejecting her subjective symptom testimony. See Lingenfelter, 504 F.3d at 1036. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Reddick

---

[4] The ALJ made no finding that plaintiff was malingering, nor does the evidence suggest plaintiff was doing so.

6

v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (quoting Lester, 81 F.3d at 834); see also Dodrill, 12 F.3d at 918.

The ALJ rejected plaintiff's credibility because he found plaintiff's statements concerning the severity of her impairments to be inconsistent with: (1) "the diagnostic tests and findings made on examination"; (2) "the level of follow-up treatment, including diagnostic testing, ordered by [plaintiff's] treating physicians"; (3) plaintiff's daily activities; and (4) plaintiff's work as a real estate agent. [AR at 50.]

As to the first reason, while an ALJ may consider whether a lack of objective medical evidence supports the degree of limitation, this "cannot form the sole basis for discounting pain testimony." Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005). "The rationale for this restriction is that pain testimony may establish greater limitations than can medical evidence alone." Id. at 680 (citing Social Security Ruling[5] 96-7p). Thus, even if the ALJ's characterization of the medical evidence were supported by substantial evidence, the ALJ would only be able to rely upon this rationale if his other reasons for discounting plaintiff's credibility are proper. However, none of the ALJ's reasons for discounting plaintiff's credibility are legally adequate.

First, there is evidence in the record of "diagnostic tests and findings made on examination" that supports plaintiff's allegations concerning the severity of her impairments. On March 4, 2003, Dr. John L. Beck, one of plaintiff's treating physicians (see infra), examined plaintiff and stated that his findings were "classic for median nerve entrapment in the forearm." [AR at 507-09.] On that visit, Dr. Beck opined that plaintiff "remains temporarily totally disabled." [AR at 508.] On May 21, 2003, an MRI of plaintiff's cervical spine revealed "some degenerative desiccation at the C5-6 disc." [AR at 512.] On February 26, 2004, Dr. Al Robert Franco, another of plaintiff's treating physicians (see infra), performed x-rays on plaintiff's cervical spine, thoracic spine, lumbar spine, shoulders, elbows, wrists, and hips, from which he opined that plaintiff has degenerative

---

[5] Social Security Rulings do not have the force of law. Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

diskogenic disease C5-C6; wedging of the vertebrae, suggestive of compressive changes; mild scoliosis of the right concavity; and sacrolized sixth lumbar vertebrae. [AR at 270-73.] In a supplemental rheumatology report dated April 30, 2004, Dr. Franco diagnosed plaintiff with systemic lupus erythematosus. [AR 385-87.] On May 9, 2005, Dr. Beck opined that plaintiff is "permanently partially disabled because of severe cervical spine problems, as well as fibromyalgia, and a non industrial temporomandibular joint syndrome" [AR at 315-16], and on October 27, 2005, he examined her, diagnosed her with cervical spine degenerative disc disease and early bilateral frozen shoulder, among other things, and opined that "[t]here is no change in her permanent and stationary status." [AR at 317-21.] On January 17, 2007, Dr. Beck reviewed x-rays of plaintiff's neck, which he stated "show[ed] that there is significant degenerative disc disease at C5-C6 in her neck that has progressed from previous films." [AR at 501-03.] Dr. Beck also opined on October 6, 2008, and December 15, 2008, that plaintiff "remains permanently disabled." [AR at 473-78.] Thus, the ALJ's assertion that plaintiff's allegations concerning her pain are inconsistent with "the diagnostic tests and findings made on examination" is not a clear and convincing reason to find her incredible. See Lingenfelter, 504 F.3d at 1036.

The second reason the ALJ provided for discounting plaintiff's credibility was that "there are discrepancies between [plaintiff's] assertions and ... the level of follow-up treatment, including diagnostic testing, ordered by the treating physicians." [AR at 50.] However, the ALJ does not specify how the treatment provided and diagnostic testing ordered by plaintiff's physicians, as reflected in the record, were lacking, and as such he did not explain how plaintiff's testimony concerning her pain contradicted "the level of follow-up treatment, including diagnostic testing, ordered by [her] treating physicians." [See AR at 50.] Therefore, this was not a sufficiently specific reason to discount plaintiff's credibility. See Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (the ALJ must provide reasoning "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony").

Moreover, there is substantial evidence in plaintiff's medical record of treatment and diagnostic testing by plaintiff's treating physicians. On March 4, 2003, Dr. Beck performed a "diagnostic Xylocaine and Celestone injection ... on [plaintiff's] pronator tunnel" to determine

whether she should be "declared permanent and stationary" as to the pronator area of her left arm, and he saw her again in August and September of 2003. [AR at 504-05, 507-08.] In September 2003, Dr. Beck referred plaintiff to a rheumatologist to treat her fibromyalgia. [AR at 504-05.] The referral was not authorized by plaintiff's insurance until 2004, and in February and April of 2004, two rheumatologists at the Arthritis Center of Riverside ("ACR"), including Dr. Franco, performed physical examinations on plaintiff. [AR at 389, 415, 434.] Also in February 2004, Dr. Franco performed x-rays on plaintiff's cervical spine, thoracic spine, lumbar spine, shoulders, elbows, wrists, and hips. [AR at 270-73.] Dr. Franco completed a complex rheumatology evaluation for plaintiff on April 1, 2004 [AR at 388-415], which he supplemented on April 30, 2004, because earlier laboratory test results "did not make clinical sense." [AR at 385-87.] Thereafter, he and other treating sources at the ACR saw plaintiff at least once every several months from May 2004 to September 2007. [AR at 295-306, 356-57.] Plaintiff also had blood work done at the ACR every several months between May 2004 and February 2007 [AR at 274-89], which in many instances was recommended by her treating sources there. [AR at 296-98, 300-01, 306, 356.] Dr. Franco also recommended in November 2006 and February 2007 that plaintiff receive a trigger point injection in her trapezius. [AR at 296, 298.] In addition, plaintiff began seeing Dr. Beck again in October 2005, during which time Dr. Beck sought authorization from plaintiff's health insurance company to perform "a new MRI of her neck to monitor progression of her cervical spine disease." [AR at 317-21.] The insurance company denied the request in December 2005, and in January 2007, Dr. Beck asked the insurance company to reconsider the request for authorization of the MRI.[6] [AR at 307-09, 423.] From January 2007 to December 2008, Dr. Beck saw plaintiff once every couple of months. [AR at 472-544.] Moreover, on September 26, 2007, Dr. Beck recommended that plaintiff undergo "surgical release of her median nerve in her right forearm" to address the "pronator entrapment in her right forearm" [AR at 492-94], and plaintiff underwent such surgery on January 7, 2008. [AR at 489-91.] Thus, the record shows that plaintiff was seen

---

[6] The record does not reflect whether the MRI was ever authorized and done. [See AR at 474-503.]

9

regularly by her treating physicians from as early as March 2003 to December 2008, i.e., more than five years. During that time, her treating physicians ordered blood work, x-rays, an MRI, and a diagnostic injection, among other things, and recommended surgery on her right forearm. Moreover, the ALJ stated twice in his decision that plaintiff "underwent extensive treatment, including physical therapy," for her impairments. [AR at 47-48.] Thus, the alleged inconsistency between plaintiff's testimony concerning her pain and "the level of follow-up treatment, including diagnostic testing, ordered by [her] treating physicians" was not a clear and convincing reason to discount plaintiff's credibility. See Lingenfelter, 504 F.3d at 1036.

Third, the ALJ also found plaintiff incredible because he found her statements as to the intensity, persistence, and limiting effects of her symptoms to be inconsistent with her "admitted daily activities," although he also did not specify how plaintiff's daily activities made her alleged limitations incredible. [See AR at 50.] Generally speaking, if a claimant has the ability to perform activities "that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent [her] from working." See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). Engaging in some household chores or activities, however, is not necessarily inconsistent with a finding of disability. See Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (benefits awarded on appeal to a claimant experiencing constant leg and back pain, despite the claimant's ability to cook and wash dishes); see also Cooper v. Bowen, 815 F.2d 557, 561 (9th Cir. 1987) (stating that the ability to assist with some household tasks was not determinative of disability) (citing Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981) (disability claimant need not "vegetate in a dark room excluded from all forms of human and social activity")).

In June 2007, plaintiff completed a Function Report, in which she stated that she was able to read, watch TV, feed her dog, go for a walk once a week, sew once or twice a week, spend 5 to 15 minutes preparing simple meals such as cereal, cheese and crackers, spaghetti, and soup, and perform household chores such as dusting, rinsing dishes, and doing the laundry, but only for 5 to 10 minutes at a time. [AR at 156-63.] That same month, plaintiff's husband completed a Third Party Function Report, in which he made observations consistent with plaintiff's assertions

about her daily activities, and stated that she only performs a few hours' worth of chores each week. [AR at 164-71.] At the hearing before the ALJ on March 18, 2009, plaintiff testified that she watches TV, listens to music, occasionally walks her dog (a small terrier), drives two to three times a week to run errands in the area immediately surrounding her home, and performs light housework broken up into small time segments, such as putting away dishes for "a couple minutes" or doing "a little dusting." [AR at 27-28.] When the ALJ asked her if there were any hobbies she used to have that she does not engage in anymore, plaintiff testified that she "used to do a lot of sewing" on her sewing machine. [AR at 28.]

The Court is not persuaded that plaintiff's ability to watch TV, prepare simple meals, feed her terrier, go for a walk once a week, and perform household chores for 5 to 10 minutes at a time amounting to no more than several hours a week supports the ALJ's finding that plaintiff could sustain gainful employment, as the ALJ has not set forth how the ability to do these limited activities translates into an ability to do activities that are "transferable to a work setting." See Fair, 885 F.2d at 603 (noting that a claimant is not required to be "utterly incapacitated" in order to be disabled and that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication"); see also Smolen v. Chater, 80 F.3d 1273,1284 n.7 (9th Cir. 1996). To properly discredit a plaintiff's credibility based on her daily activities, the ALJ must find that plaintiff "is able to spend a *substantial part* of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quoting Morgan v. Comm'r of Social Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)) (emphasis in original); see also Nelson v. Astrue, 610 F.Supp.2d 1070, 1076 (C.D. Cal. 2009). The ALJ made no findings that plaintiff is capable of performing these activities repeatedly or for substantial periods of time without rest, and did not explain how plaintiff's admitted daily activities are transferable to the workplace. See Fair, 885 F.2d at 603. Nor did the ALJ provide an explanation as to how plaintiff's ability to perform these activities is inconsistent with her claimed limitations. See Reddick, 157 F.3d at 722 (an ability to take part in some household tasks bears on a claimant's credibility only to the extent that the level of activity is in fact inconsistent with the

alleged limitations). The Court therefore finds that the ALJ failed to provide clear and convincing reasons, based upon plaintiff's activities, for discrediting her alleged limitations.

Finally, the ALJ discounted plaintiff's credibility because he found her statements concerning the severity of her impairments to be inconsistent with her work as a real estate agent. [AR at 50.] In weighing a claimant's credibility, an ALJ may consider the claimant's prior work record and efforts to work. SSR 96-7p; see also Thomas, 278 F.3d at 958-59. An ALJ's rejection of a claimant's subjective symptom testimony on the basis that the claimant "had an extremely poor work history and has shown little propensity to work in her lifetime" is legally adequate. See Thomas, 278 F.3d at 959 (internal quotation marks omitted). However, "[i]t does not follow from the fact that a claimant tried to work for a short period of time and, because of [her] impairments, *failed*, that [she] did not then experience pain and limitations severe enough to preclude [her] from *maintaining* substantial gainful employment." Lingenfelter, 504 F.3d at 1038 (emphases in original).

Plaintiff worked full-time as an insurance company claims representative from 1988 to 2003. [AR at 147-48.] Plaintiff testified that she left that job in February 2003 because of the pain in her hands, neck, back and arms. [AR at 25-26.] Thereafter, she worked as a real estate salesperson. [AR at 147.] She had gross earnings of $18,378 in 2006 [AR at 241], $8,918 in 2007 [AR at 243], $10,358 in 2008 [AR at 245], and $5,374 in 2009 [AR at 247]. Her work during those years consisted of two transactions and one lease in 2006; one lease and three referrals in 2007; two full transactions and one split transaction in 2008; and two transactions in 2009. [AR at 24-25, 240.] Plaintiff testified that in 2007, she did not work every day, but that when she did, she averaged one to two hours a day, and totaled "maybe five, six hours a week." [AR at 31.] Plaintiff testified that in 2008, she worked "extremely part-time," performing transactions for friends and family members of friends such that she did not need to do any marketing. [AR at 24.] In 2008, she worked only during the months of May, June, and October. [AR at 23.]

In discounting plaintiff's credibility on this ground, the ALJ referenced plaintiff's "work as a real estate agent." [See AR at 50.] While he did not elaborate on this reason for finding plaintiff incredible, the ALJ noted earlier in the decision plaintiff's annual gross earnings from 2006 to 2008

[see AR at 45-46], and pointed out the number of transactions she completed in 2007 and 2008. [See AR at 49.] It thus appears that the ALJ rejected plaintiff's testimony because she performed some work and had some earnings after her alleged disability onset date of January 2, 2006. However, plaintiff testified that in 2007, she did not work every day, and that when she did, she only worked one to two hours a day. In 2008, plaintiff only worked in May, June, and October, and she testified that her work that year was "extremely part-time." Moreover, there was an overall decline in plaintiff's gross earnings from 2006 to 2009, with the highest figure of $18,378 being earned in 2006, the lowest figure of $5,374 being earned in 2009, and figures in between these two amounts being earned in 2007 and 2008. Thus, it does not follow from plaintiff's work history that she did not experience, as she testified, pain and limitations severe enough to preclude her from maintaining substantial gainful activity. See and compare Lingenfelter, 504 F.3d at 1033, 1038-39 (where claimant worked for a nine-week period out of economic necessity, but was fired from that job after eight weeks because he was too slow to perform the job adequately, and testified that he could not do the job again due to his pain, ALJ improperly rejected his pain testimony on the ground that he had worked), with English v. Astrue, 2011 WL 4437360, at *5 (W.D. Wash. Sept. 19, 2011) (ALJ gave legally adequate reason to find the plaintiff not fully credible where he cited the plaintiff's work history, which included unloading trucks for 8-10-hour and 12-hour shifts, and babysitting seven days a week and 400 hours a month, after his alleged disability onset date). This is not a case where plaintiff "had an extremely poor work history and has shown little propensity to work in her lifetime," as demonstrated by her 15-year work history as a full-time insurance claims representative. See Thomas, 278 F.3d at 959 (internal quotation marks omitted). Rather, the fact that plaintiff repeatedly tried to work, but was increasingly unable to do so, could support her allegations of disabling pain in her head, arms, and back, and from her neck to the scapula or rhomboid area. See Lingenfelter, 504 F.3d at 1038-39 (citing Fair, 885 F.2d at 604); see also Reddick, 157 F.3d at 722 ("disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations"). Thus, plaintiff's sporadic and limited work as a real estate agent was not an adequate reason to find her testimony regarding her pain and limitations incredible.

The ALJ did not offer a legally adequate reason for discounting plaintiff's credibility. Remand is warranted.

## VI.

## **REMAND FOR FURTHER PROCEEDINGS**

As a general rule, remand is warranted where additional administrative proceedings could remedy defects in the Commissioner's decision. See Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir.), cert. denied, 531 U.S. 1038 (2000); Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984). In this case, remand is appropriate to properly evaluate plaintiff's subjective symptom testimony. The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: January 23, 2012

                                                  PAUL L. ABRAMS
                                   UNITED STATES MAGISTRATE JUDGE